IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

PRINCETON COMMUNITY HOSPITAL
ASSOCIATION, INC.

        Plaintiff,

v.

                                         Civil Action No. 19-C-59-MW

NUANCE COMMUNICATIONS, INC.



        Defendant.

FILED
MAR 18 2019
JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

## STIPULATION PURSUANT TO W. VA. R. CIV. P. 6(b)

      The parties, by their undersigned counsel, hereby stipulate that the time within which the defendant, Nuance Communications, Inc., must respond to the Complaint in this matter is extended to and including Monday, 13 May 2019.

Dated:  March 13, 2019

                                      Respectfully,

Defendant, NUANCE COMMUNICATIONS, INC.,
by its attorneys,

_A. L. Emch_
_by Maccie a. Blos_
A.L. Emch (WV Bar #1125)
JACKSON KELLY PLLC
500 Lee Street East
Suite 1600
Charleston, WV 25301-3202
(304) 340-1172
aemch@jacksonkelly.com

Plaintiff, PRINCETON COMMUNITY
HOSPITAL, INC., by its attorneys,

Larry J. Rector (WV Bar #6418)
STEPTOE & JOHNSON PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330
(304) 933-8151
larry.rector@steptoe-johnson.com

David C. Lashway (mot. for admission *pro hac vice* to be submitted)
John W. Woods, Jr. (mot. for admission *pro hac vice* to be submitted)
Jennifer B. Seale (mot. for admission *pro hac vice* to be submitted)
BAKER & MCKENZIE LLP
815 Connecticut Avenue, NW
Washington, DC 20006
(202) 835-6179
david.lashway@bakermckenzie.com
john.woods@bakermckenzie.com
jennifer.seale@bakermckenzie.com

Gary Thompson
Kristin Davis
THOMPSON HAMMERMAN DAVIS LLP
1015 15th Street NW, Ste. 600
Washington, DC 20005
(202) 256-9910
gthompson@thompsonhd.com
kdavis@thompsonhd.com

FILED
MAR 22 2019
JULIE BALL
CLERK CIRCUIT COURT

## HEALTHCARE MASTER AGREEMENT

THIS HEALTHCARE MASTER AGREEMENT ("the Agreement") is effective as of the date set forth below by the last Party hereto (the "Effective Date") by and between Nuance Communications, Inc., having a place of business at 1 Wayside Road, Burlington, MA. 01803, USA ("Nuance") and Princeton Community Hospital, having a place of business at 122 12th Street, PO Box 1369, Princeton, WV 24740, USA ("Company"). This Agreement consists of the General Terms and Conditions, and all Schedules and Exhibits hereto. Nuance and Company are sometimes referred to individually as a "Party" and collectively as the "Parties."

### General Terms and Conditions

In consideration of the mutual covenants stated below, and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

**1.   DEFINITIONS.**

In addition to the terms defined elsewhere in this Agreement, the following terms used in this Agreement shall have the meanings set forth below:

**1.1.**   "Affiliates" means any entity that is directly or indirectly controlled by, under common control with, or in control of a Party. For those purposes, an entity shall be treated as being controlled by another if that other entity (i) has fifty percent (50%) or more of the votes in such entity, or (ii) is able to direct its affairs and/or to control the composition of its board of directors or equivalent body.

**1.2.**   "Authorized User(s)" are those individuals who are authorized, subject to the terms and conditions of this Agreement, to access and use the Software and/or Hosted Services, which individuals are limited to those authorized under the applicable Schedule or Order.

**1.3.**   "Company PO" means a Company-generated purchase order for Software, Equipment and/or Services, that (i) references the quote number and date of the applicable Nuance Quote against which the purchase order is issued, or (ii) sets forth, in detail, the Software licenses, Equipment, and/or Services that Company seeks to purchase (including number of license units and license type), the price associated with each item, and includes a cross-reference to this Agreement.

**1.4.**   "Data" means the audio, image, and/or text data input, all data elements output (e.g. interpretation of clinical contents in xml or other format), associated transcripts or medical reports, whether in draft or final form, any information received from Company under any Order under this Agreement, or any other clinical information received by Nuance from Company under this Agreement.

**1.5.**   "Documentation" means the administrative guide and user's guide provided by Nuance to Company to facilitate the use of the Nuance Products and Hosted Services.

**1.6.**   "Equipment" means Nuance Equipment and Third Party Equipment, collectively.

**1.7.**   "Hosted Service" means a Nuance proprietary subscription-based software as a service (SaaS) offering specified in an Order, as more particularly described in the applicable Schedule. Any software provided by Nuance which is sited at Company (for example client software to access the Hosted Services) is considered Software and subject to the terms governing Software.

**1.8.**   "Maintenance Services" means (i) the services that Nuance provides, pursuant to an Order, to maintain Software and Equipment (as applicable), as more fully described at http://support.nuance.com/healthcare under "Healthcare Hardware and Software Maintenance Options" ("Web Maintenance Terms") or (ii) as otherwise provided in an applicable Schedule. Maintenance Services does not mean or include Hosted Service support.

**1.9.**   "Nuance Equipment" means Nuance manufactured hardware specified in an Order.

**1.10.**   "Nuance Products" means the Nuance Software and Nuance Equipment, collectively.

**1.11.**   "Nuance Quote" means a Nuance-generated quotation for Software, Equipment and/or Services, that lists the Software licenses, Equipment and/or Services that Company seeks to purchase (including number of license units and license type), and the price associated with each item.

**1.12.**   "Nuance Software" means the object code version of any Nuance proprietary software product specified in an Order, including all corrections, modifications, enhancements, Updates and Upgrades (if any) thereto that Nuance may provide to Company under this Agreement, and all related Documentation.

**1.13.**   "Order" means an order for Software licenses, Equipment and/or Services that is (a) issued by Company in the form of a Nuance Quote or Company PO signed by Company (physically or electronically), and (b) accepted by Nuance. An Order includes any applicable Statement of Work.

CONFIDENTIAL – PAGE 1

## EXHIBIT 1

1.14.  **"Professional Services"** means any installation, project management and/or consulting services provided by Nuance pursuant to an Order, as specified in an Order, and which may be more fully described in a Statement of Work.

1.15.  **"Schedule"** means each of the schedules set forth in Exhibit B of this Agreement or as added to Exhibit B by amendment.  Schedules are a part of this Agreement and define the specific terms that apply to the applicable Nuance Products and Services.

1.16.  **"Services"** means Maintenance Services, Training Services, Professional Services, Hosted Services and/or Transcription Services, as applicable.

1.17.  **"Software"** means Nuance Software and Third Party Software, collectively.

1.18.  **"Statement of Work"** or **"SOW"** means the supplement to an Order, setting forth, in more detail, the Professional Services and/or Training Services purchased under the Order.

1.19.  **"Term"** is defined in Section 7.1 of these General Terms and Conditions.

1.20.  **"Third Party Equipment"** means any third party manufactured hardware specified in an Order.

1.21.  **"Third Party Software"** means any third party proprietary software specified in an Order.

1.22.  **"Training Services"** means any training services provided by Nuance pursuant to an Order, as specified in an Order.

1.23.  **"Transcription Services"** means any transcribing services and/or editing services provided by Nuance pursuant to an Order, as specified in an Order and more fully described in the applicable Schedule for Transcription Services.

1.24.  **"Update"** means a release of Nuance Software, issued as part of Maintenance Services, that may include minor feature enhancements, and/or bug fixes and/or fixes of minor errors and/or corrections, and typically is identified by an increase in a release or version number to the right of the first decimal (for example, an increase from Version 5.1 to 5.2 or from Version 5.1.1 to 5.1.2).  "Update" shall not be construed to include Upgrades.

1.25.  **"Upgrade"** means a release of Nuance Software, issued as part of Maintenance Services, that may include some feature enhancements and/or additional capabilities (functionality) over versions of the Nuance Software previously supplied to Company, and typically is identified by an increase in the release or version number to the left of the decimal (for example, an increase from Version 5.2 to Version 6.0).  Upgrades do not include new software and/or products that Nuance, in its sole discretion, designates and markets as being independent from the previously purchased Nuance Software.

2.   SCOPE OF AGREEMENT.  Company agrees to purchase from Nuance, and Nuance agrees, subject to the terms and conditions of this Agreement, to supply to Company the Software licenses, Equipment and Services, as specified in each Order.  Nuance may accept an Order by fulfilling it.

3.   GRANT OF RIGHTS.

3.1.   Software.

    3.1.1.  License Grant.  Subject to the terms and conditions of this Agreement, Nuance grants to Company, and Company accepts, a limited, non-exclusive, non-transferable, non-sub-licensable license to permit its Authorized Users to use the Software and / or Hosted Services and associated Documentation listed in the applicable Order, in accordance with the license grant specified in the applicable Schedule, provided such use is (i) commensurate with the intended use of the Software (as prescribed in this Agreement and the applicable Documentation), and (ii) solely for Company's internal business purposes.  Any open source software which may be included in the Software is licensed under the applicable public license.

    3.1.2.  Third Party Software.  Third Party Software supplied by Nuance is subject to the terms and conditions of this Agreement and the applicable third party terms as may be specified in an applicable Schedule or Order.

    3.1.3.  Updates and Upgrades.  Upon installing any Update or Upgrade to Nuance Software, Company shall discontinue use of the previous version of such Nuance Software and Company will be licensed to use only the updated or upgraded version of the Nuance Software, in accordance with the license granted by Nuance with respect to such Nuance Software.

3.2.   Equipment.  Equipment supplied by Nuance is subject to the terms and conditions of this Agreement and, if Third Party Equipment, the applicable third party terms as may be specified in an applicable Schedule or Order.

3.3.   Proprietary Rights; Restrictions.  Notwithstanding any use of the term "sale," "purchase" or other similar terms in this Agreement, Nuance and its licensors retain all right, title and interest in and to the Software, Services and Documentation, and any derivative works thereof, including, but not limited to, all patent, copyright, trade secret, trademark and other intellectual property rights associated therewith.  Without limiting the generality of the foregoing, Company will not itself, directly or indirectly, and will not permit Authorized Users, other employees or contractors, or any third party to (i) access the Hosted Services with software or means other than as described in this Agreement, (ii) submit any automated or recorded requests to the Hosted Services except as otherwise provided in this Agreement, (iii) modify, port, translate, or create derivative works of the Software, Services, or Documentation, (iv) decompile, disassemble, reverse engineer or attempt to reconstruct, identify or

discover any source code, underlying ideas, or algorithms of the Software or Services by any means, (v) sell, lease, license, sublicense, copy, assign, transfer, share, market, or distribute the Software, Services or Documentation, except as expressly permitted in this Agreement, (vi) grant any access to, or use of, the Software or Services on a service bureau, timesharing or application service provider basis, (vii) remove any proprietary notices, labels or marks from the Software, Services or Documentation, (vii) release to a third party the results of any benchmark testing of the Software or Services, or (viii) defeat or circumvent any controls or limitations contained in or associated with the use of the Software. In no event shall anything in this Agreement or in Nuance's conduct or course of dealing convey any license, by implication, estoppel or otherwise, under any patent, copyright, trademark or other intellectual property right not explicitly licensed. All rights not expressly granted to Company under this Agreement are reserved by Nuance and/or its licensors.

3.4.   Authorized Users.   Company is responsible for each Authorized User's compliance with the terms of this Agreement and guarantees each Authorized User's compliance with the terms of this Agreement. Company will be liable for any act or omission by an Authorized User that, if performed or omitted by Company, would be a breach of this Agreement. Company will, at its expense, defend any and all claims, actions, suits, or proceedings made or brought against Nuance by any Authorized User with respect to this Agreement (each, a "User Claim"), and pay any losses, claims, costs, expenses, damages, or liabilities (including reasonable attorneys' fees) sustained or incurred by Nuance arising from a User Claim. Company shall promptly notify Nuance upon learning of any actual or suspected unauthorized possession or use of any Software or Hosted Services supplied under this Agreement.

4.   SERVICES.   Subject to the terms and conditions of this Agreement, Nuance will provide the Services as may be specified in an Order.

4.1.   Fixed Term Licenses.   Unless otherwise provided in an applicable Schedule or Order, Maintenance Services are provided for the duration of each fixed term license to Software.

4.2.   All Other Licenses.   Unless otherwise agreed by Nuance, Company is required to purchase first year Maintenance Services for all other licenses of Software. Nuance will provide the first year Maintenance Services indicated in the Order. If Nuance offers Maintenance Services for the applicable Software and/or Equipment for renewal periods, Nuance will, at least thirty (30) days prior to the end of the then-current Maintenance Service term, invoice Company for a subsequent one-year renewal term of Maintenance Services at the rates in effect on the renewal date. Company shall, if it wishes to renew annual Maintenance Services for the applicable Software and/or Equipment, pay the invoice for renewal Maintenance Services in full within thirty (30) days of the date of such invoice.

4.3.   Maintenance Services Terms.

(a)   Company acknowledges that failure to pay its invoice for Maintenance Services within the required 30 day period will result in Maintenance Services expiring with respect to such Software and/or Equipment. If permitted by Nuance, Company may reinstate Maintenance Services that have expired, provided that Company first pays all Maintenance Services fees that would have been due for the period following the expiration of the previous Maintenance Service period, and orders all Professional Services (at Nuance's then-current rates) necessary to implement the then-current version of the applicable Software.

(b)   The annual Maintenance Services Term shall commence as described in the applicable Schedule and Order, and each subsequent annual Maintenance Services Service Term will commence on the anniversary thereof. Company must purchase the same Maintenance Service level for all Software licenses and Equipment units for a given Nuance Product.

(c)   Unless otherwise agreed, Nuance shall not be obligated to provide Maintenance Services for, or required as result of, (i) any Software or Equipment modified by any party other than Nuance, (ii) any Software or Equipment used for other than its intended purpose, (iii) any Software or Equipment used with equipment not specified as compatible in the Documentation, (iv) any Software or Equipment being used with software not supplied by Nuance, unless specified as compatible in the Documentation, (v) any Software or Equipment (or any associated equipment, software or firmware) which Company failed to properly install or maintain, (vi) any willful misconduct or negligent action or omission of Company, (vii) any computer malfunction not attributable to the Software or Equipment, or (viii) damage to Software or Equipment from any external source, including computer viruses not attributable to Nuance, computer hackers, or force majeure events.

4.4.   Training Services.   Unless otherwise agreed by the Parties, Training Services will be held at a designated Nuance location during Nuance's standard business hours, excluding Nuance recognized holidays. If the Parties agree to hold any Training Services at Company's site, all such Training Services (including associated travel time) will be conducted between the hours of 8:00 a.m. to 5:00 p.m. local Company site time, Monday through Friday, excluding Nuance recognized holidays. Company shall ensure that all Training Services attendees are or will be Authorized Users and have the skills and experience to participate in the training sessions.

4.5.   Professional Services.   Professional Services will be provided by Nuance in accordance with the terms in the applicable Schedule. Unless otherwise agreed by the Parties, all Professional Services (including associated travel) will be conducted

between the hours of 8:00 a.m. to 5:00 p.m. local Company site time, Monday through Friday, excluding Nuance recognized holidays. Nuance grants Company a non-exclusive, non-transferable license to use the tangible results (if any) of Professional Services in conjunction with Nuance Products for Company's internal use as designated under the Agreement.

**4.6.** **Hosted Services.** Hosted Services will be as further described in, and will be provided by Nuance in accordance with, the applicable Schedule.

**4.7.** **Transcription Services.** Transcription Services will be as further described in, and will be provided by Nuance in accordance with, the applicable Schedule.

**4.8.** **On-Location.** If Nuance will perform Services at a location other than a Nuance facility, Company shall provide or arrange for the necessary equipment, information, and facilities required by Nuance to perform such Services, as reasonably specified by Nuance.

**5.** **MEDICAL CARE RESPONSIBILITY.** COMPANY ACKNOWLEDGES THAT SOFTWARE AND SERVICES ARE NOT ERROR FREE. FURTHERMORE, SPEECH RECOGNITION, NATURAL LANGUAGE PROCESSING, AND MEDICAL FACT EXTRACTION (SUCH AS PERFORMED IN MEDICAL TRANSCRIPTION SERVICES) ARE STATISTICAL PROCESSES THAT ARE INHERENTLY INACCURATE AND THAT ERRORS OCCUR IN THE CONTENT, OUTPUT AND RESULTS OF SUCH PROCESSES THAT NUANCE IS NOT RESPONSIBLE FOR. COMPANY AGREES THAT IT IS THE SOLE RESPONSIBILITY OF COMPANY AND EACH AUTHORIZED USER TO IDENTIFY AND CORRECT ANY SUCH ERRORS AND INACCURACIES BEFORE USING AND/OR RELYING ON THE CONTENT, RESULTS OR OUTPUT OF ANY SOFTWARE AND/OR SERVICES PROVIDED UNDER THIS AGREEMENT, FOR ANY MEDICAL-PRACTICE-RELATED PURPOSES. COMPANY AGREES THAT NUANCE IS NOT PROVIDING MEDICAL PRACTICE ADVICE, AND THAT COMPANY AND EACH AUTHORIZED USER WILL CONSULT WITH AND RELY EXCLUSIVELY ON ITS OWN PHYSICIANS OR OTHER MEDICAL DIRECTION FOR REVIEW, NECESSARY REVISIONS AND APPROVAL OF ANY AND ALL SUCH MEDICAL-PRACTICE-RELATED CONTENT, RESULTS OR OUTPUT. NUANCE ASSUMES NO RESPONSIBILITY FOR ANY OF THE FOREGOING, AND COMPANY SHALL INDEMNIFY AND HOLD HARMLESS NUANCE AND ITS AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, CONTRACTORS AND AGENTS (EACH, AN "INDEMNIFIED PARTY"), FROM AND AGAINST ANY DAMAGES, CLAIMS OR OTHER LIABILITIES FOR THE WRONGFUL DEATH OR PERSONAL INJURY OF A THIRD PARTY DIRECTLY OR INDIRECTLY CAUSED OR ARISING OUT OF (I) COMPANY'S USE OR NON-USE OF ANY SOFTWARE OR SERVICE, (II) ANY CONTENT, RESULTS OR OUTPUT FROM ANY SOFTWARE OR SERVICE, (III) ANY MEDICAL-PRACTICE-RELATED RECOMMENDATIONS PROVIDED BY NUANCE, AND (IV) COMPANY'S FAILURE TO IDENTIFY AND CORRECT ANY INACCURACIES AND/OR ERRORS IN THE CONTENT, RESULTS OR OUTPUT OF ANY SOFTWARE AND/OR SERVICES PROVIDED UNDER THIS AGREEMENT.

**6.** **FEES, PAYMENT, TAXES & SHIPMENT.**

**6.1.** **Fees.** Company shall pay to Nuance all fees and other charges specified in each Order. All fees due under the Agreement are non-cancelable.

**6.2.** **Expenses.** Prices do not include travel expenses that may be incurred in the course of providing Services, including, but not limited to, transportation, meals, lodging and other living expenses. Company shall pay or reimburse Nuance for all such charges and expenses reasonably incurred

**6.3.** **Taxes.** Company shall pay all taxes, duties, import and export fees, and any other charges or assessments, except the withholding of income taxes, which are applicable to the performance of this Agreement, and shall reimburse Nuance for any encumbrance, fine, penalty, or other expense which Nuance may incur as a result of Company's failure to pay any such taxes, duties, fees, charges, or assessments. For purposes of this Agreement, the term "taxes" shall include, but is not limited to any and all assessments and other governmental charges, impositions and liabilities, including taxes based upon or measured by gross receipts, income, profits, sales, use, value added, ad valorem, consumption, transfer, franchise and withholding taxes, except taxes imposed on the net income of Nuance, together with all interest, penalties and additions imposed with respect to such amounts. If any applicable law requires Company to withhold an amount from any payment to Nuance hereunder, Company shall effect such withholding, remit such amount to the appropriate taxing authority, and supply Nuance with the tax receipt evidencing the payment of such amount to the government within sixty (60) days of its receipt by Company. To the extent that an income tax convention between the country of Nuance and the country of Company permits, upon the filing of a proper application, for a reduction or elimination of such withholding tax, the Parties shall cooperate in the completion and filing of such application. Company shall provide to Nuance, and Nuance shall complete and return to Company, all applicable forms required by the governing tax authority in order to secure the reduction or elimination of withholding tax as authorized by the convention.

**6.4.** **Payment.** Except as otherwise set forth in the applicable Order or Schedule, Company shall pay all invoices issued in U.S. dollars, either by mail or wire transfer, within thirty (30) days of the date of Invoice in accordance with the remittance information contained on the invoice. Interest shall accrue at the rate of one and one half percent (1.5%) per month on any amounts past due. Company shall reimburse Nuance for all reasonable costs incurred (including reasonable attorneys' fees) in collecting past due amounts from Company. If Company fails to pay for any Equipment, Nuance reserves the right to repossess such Equipment. Nuance reserves the right to suspend Services to Company in the event any invoice is past due. Company must

notify Nuance within thirty (30) days of the date of invoice if it disputes any amount contained in an invoice. Notwithstanding the foregoing, if Company elects not to renew annually-contracted auto-renewing Maintenance Services, Company shall not be required to pay the invoice for subsequent annual renewals, provided any requirements in the applicable Schedule or Order for prior written notice of non-renewal are met.

6.5.    Company Purchase Orders.  Company agrees to pay Nuance's invoices without a purchase order reference.  Company acknowledges and agrees that if it is Company's standard practice to issue unsigned purchase orders, such purchase orders are valid and binding.  Neither Party shall be subject to provisions of any pre-printed terms on or attached to purchase orders generated by Company, or any Company policies, regulations, rules, or the like, including those set forth in any Company-sponsored registration system, regardless if such requires affirmative acknowledgement from a Nuance representative.

6.6.    Leasing Arrangements.  If Company has entered into a lease arrangement with a third-party financing/leasing company ("Lessor") to finance an applicable Order, then subject to prior mutual written agreement between Nuance and Company, which shall not be unreasonably withheld by Nuance, and subject to the existence of a suitable arrangement between Nuance and the Lessor, Nuance shall, at Company's request, submit the invoice(s) for the Order to, and accept payment for the Order from, the Lessor.  Notwithstanding the foregoing, Company remains fully liable to Nuance for all amounts due and owing under the Order.  If Lessor fails to pay Nuance any amount due under the Order, when due, Company shall pay such amounts to Nuance immediately upon receipt of Nuance's invoice.

6.7.    Audit.  Company shall keep full, true and accurate records and accounts to support its use of the Software and Hosted Services, as applicable, under this Agreement.  Nuance, or a third party appointed by Nuance, will have the right, not more than once a year and upon reasonable notice, to conduct an audit of Company's systems and records, to confirm compliance with the terms of this Agreement.  Any audit will be performed during Company's normal business hours.  If an audit reveals that Company's Software or Hosted Services usage exceeds its usage rights, as granted by Nuance, Company shall pay Nuance for all such excess usage, based on Nuance's standard pricing in effect at the time of the audit.  If such excess usage exceeds five percent (5%) of the authorized usage, Company shall also pay Nuance's reasonable costs of conducting the audit.  Nothing in this Section 6.7 will limit any other remedy available to Nuance.

6.8    Shipment.  For Orders with Software and/or Equipment requiring delivery within the United States, such Software and/or Equipment will be shipped "FOB Shipping Point."  For Orders with Software and/or Equipment requiring delivery outside the United States, unless otherwise specified in the applicable Schedule or Order, such Software and/or Equipment will be shipped "CPT Destination," or, at Nuance's option, "EX WORKS" with carrier arranged by Company.  Company shall bear all shipping, freight and transportation charges from Nuance's warehouse facility.

7.    TERM; TERMINATION.

7.1.    Term.  This Agreement commences on the Effective Date and, unless terminated earlier in accordance with the terms hereof, will continue in effect, unless the Parties otherwise agree in writing ("Term").  Each Party's rights and obligations related to Software licenses and/or Services delivered pursuant to an Order shall be limited to the duration or term of such Software license or Service as specified in the applicable Schedule or Order.

7.2.    Termination for Cause.  Either Party may terminate this Agreement or any Order upon written notice if the other Party commits a material breach of this Agreement or such Order and fails to cure such breach within thirty (30) days of receipt of written notice describing such breach.  Notwithstanding the foregoing, Nuance may terminate this Agreement and/or any Order immediately upon written notice to Company if Company (a) infringes Nuance's intellectual property rights, (b) commits, or permits any third party to commit, any breach of confidentiality obligations under Section 9 ("Confidentiality"), or (c) Company has a receiver appointed to handle its assets or affairs, admits that it is insolvent, or is otherwise unable to pay its debts as they mature, or ceases to do business in the ordinary course.

7.3.    Effect of Termination.  Upon termination of this Agreement, all Orders issued under this Agreement will immediately terminate.  Upon the termination of an Order, all Software licenses and Services under such Order shall immediately terminate, and Company shall immediately (a) cease use of the applicable Software (in any form, including partial copies in its possession or under its control) and/or Services, (b) return to Nuance or destroy all copies of the Software and certify in writing to Nuance that no copies have been retained by Company within ten (10) days of any expiration or termination, and (c) pay any outstanding amounts due to Nuance.

7.4.    Survival.  Notwithstanding anything to the contrary in this Section 7, the provisions of Sections 1, 3.3, 3.4, 5, 6, 7.3, 7.4, 8, 9, 10, 11, 12, and 14 of these General Terms and Conditions shall survive expiration or termination of this Agreement.

8.    HIPAA.  The Parties agree to the Business Associate Terms and Conditions attached hereto as Exhibit A and made a part of this Agreement, wherein Nuance may be referred to as "Business Associate" and Company may be referred to as "Covered Entity."

9.    CONFIDENTIALITY.

9.1.    Definition.  Subject to the exceptions contained in this Section 9.1, "Confidential Information" shall mean (a) all information disclosed by a Party or its Affiliates (the "Disclosing Party"), in whatever tangible form or otherwise, to the other

Party or its Affiliates (the "Receiving Party") that is clearly marked "confidential" or with some other proprietary notice, (b) all information disclosed orally or otherwise in intangible form by the Disclosing Party and designated as confidential or proprietary at the time of the disclosure, and (c) the Software, Documentation, and Information provided as part of any Services. Notwithstanding the above, information shall not be deemed Confidential Information to the extent that it (i) was generally known and available in the public domain at the time it was disclosed or subsequently becomes generally known and available in the public domain through no fault of the Receiving Party, (ii) was rightfully known to the Receiving Party at the time of disclosure without any obligation of confidentiality as evidenced by the Receiving Party's written records, (iii) is disclosed with the prior written approval of the Disclosing Party, (iv) was independently developed by the Receiving Party by persons without any access to the Confidential Information of the Disclosing Party, or (v) is protected health information or any other personally identifiable information, the protection of which is governed by the Business Associate Terms and Conditions identified in Exhibit A. The obligation not to use or disclose Confidential Information will remain in effect until one of these exceptions occurs.

9.2.    Permitted Disclosure. Notwithstanding any other provision of this Agreement, disclosure of Confidential Information shall be permitted if such disclosure (a) is in response to an order of a court or other governmental body, provided, however, that the responding Party shall first have given notice to the other Party hereto and shall have made a reasonable effort to obtain a protective order requiring that the Confidential Information so disclosed be used only for the purposes for which the order was issued, or (b) is otherwise required by law.

9.3.    Use and Obligations. The Receiving Party will not use the Disclosing Party's Confidential Information for purposes other than as provided in this Agreement. The Receiving Party shall protect the Disclosing Party's Confidential Information, to prevent its unauthorized use, disclosure, or publication to third parties, by using the same degree of care, but no less than a reasonable degree of care, as the Receiving Party uses to protect its own Confidential Information of a like nature. Confidential Information received by a Receiving Party hereto may be disclosed to and used by such Receiving Party's employees, agents and contractors in accordance with the terms and conditions of this Agreement, and each Party shall be liable for any act or omission by its Affiliates, and its and their respective employees, agents and contractors, which, if performed or omitted by such Party, would be a breach of this Agreement. Each Party agrees that its Affiliates, and its and their respective employees, agents and contractors, shall be bound by the terms of an agreement protecting against unauthorized use or disclosure of Confidential Information that is at least as protective of the Disclosing Party's rights as this Agreement. No Confidential Information shall be disclosed to any person who does not have a need for such information.

9.4.    Return of Confidential Information. The Receiving Party shall return to the Disclosing Party, or destroy, all Confidential Information of the Disclosing Party in tangible form (i) upon the written request of the Disclosing Party, or (ii) upon the expiration or termination of this Agreement, whichever comes first. In both cases, the Receiving Party shall, upon request, promptly certify in writing that it has complied with the obligations of this Section 9.4. Notwithstanding the foregoing, each Party may retain a copy of the Confidential Information in electronic format in accordance with its corporate security and/or disaster recovery procedures.

10.    DATA. Company is solely responsible for obtaining all necessary consents under applicable laws and regulations in order to allow Nuance to use the Data in accordance with this Section 10. Company gives Nuance the right, and Nuance has permission to use, the Data in accordance with this Section 10, and to de-identify the Data in accordance with 45 C.F.R. §164.514. Nuance and third parties acting under the direction of Nuance may use, compile (including creating statistical and other models), annotate and otherwise analyze the Data to develop, train, tune, enhance and improve the speech recognition, natural language understanding and other components of its software and services. Nuance shall own all intellectual property rights in all enhancements and improvements to its software and services that result from such use of the Data. Any and all information that Company provides will remain confidential, and Nuance may only provide access to Data to third parties acting under the direction of Nuance in order to fulfill the foregoing use of the Data, pursuant to confidentiality agreements, or to meet legal or regulatory requirements, such as under a court order or to a government institution if required or authorized by law. Nuance will not use the names of individuals and companies to contact anyone for any reason. Nuance receives, uses and/or maintains only copies of official medical records or portions thereof, the originals of which must continue to be maintained by Company or its contractors. Accordingly, the foregoing Data shall not be deemed an official medical record or health record for any patient.

11.    LIMITED WARRANTIES.

11.1.    Nuance Software Warranty. Nuance warrants that upon initial installation of the Nuance Software (in the case of Nuance Software that, pursuant to the applicable Order, is to be installed by Nuance) or initial delivery of the Nuance Software to Company (in all other cases), and for a period of ninety (90) days thereafter (the "Software Warranty Period"), the Nuance Software will operate in all material respects in conformity with its Documentation. Company's sole and exclusive remedy and Nuance's sole obligation for any breach of the warranty set forth in this Section 11.1 will be for Nuance, at Nuance's option, to undertake reasonable efforts to correct or replace the nonconforming Nuance Software reported by Company during the Software Warranty Period, or to accept a return of the Nuance Software and refund to Company the fees paid by Company to Nuance for such non-conforming Nuance Software, and terminate the license to any such non-conforming Nuance Software.

**11.2.   Nuance Equipment Warranty.**  Nuance warrants that upon initial installation of the Nuance Equipment (in the case of Nuance Equipment that, pursuant to the applicable Order, is to be installed by Nuance) or initial delivery of the Nuance Equipment to Company (in all other cases), and for a period of ninety (90) days thereafter (the "Equipment Warranty Period"), the Nuance Equipment will operate in all material respects in conformity with its Documentation.  Company's sole and exclusive remedy and Nuance's sole obligation for any breach of the warranties set forth in this Section 11.2 will be for Nuance, at Nuance's option, to undertake reasonable efforts to correct or replace the nonconforming Nuance Equipment reported by Company during the Equipment Warranty Period, or to accept a return of and refund to Company, the fees paid by Company to Nuance for such non-conforming Nuance Equipment.

**11.3.   Services Warranty.**  Nuance warrants that the Maintenance Services, Training Services and Professional Services provided by Nuance pursuant to this Agreement shall be performed in a professional manner by trained and skilled personnel. Company must notify Nuance of any breach of such warranty within ninety (90) days following performance of the non-conforming Services giving rise to the breach of warranty claim.  Company's sole and exclusive remedy and Nuance's entire liability for any breach of the warranty set forth in this Section 11.3 will be for Nuance to re-perform such non-conforming Services that Company notified Nuance of in accordance herewith. The only warranty rights, if any, for Hosted Services and Transcription Services shall be those set forth in the relevant Schedule.

**11.4.   Limitation of Warranties.**  The warranties set forth in this Section 11 ("Limited Warranties") shall not apply, and Nuance shall have no warranty obligation or liability with respect to, (a) any Nuance Product that (i) is damaged through no fault of Nuance, (ii) is modified by anyone other than Nuance, (iii) is used for any purpose other than its intended purpose (as specified in the Documentation), (iv) is used with equipment not specified as compatible with the Nuance Product in such Nuance Product's Documentation, (v) is used with software not specified as compatible with said Nuance Product in the Nuance Product's Documentation, (vi) Company fails to properly install or maintain, (b) any computer malfunction not attributable to the Nuance Products or Nuance, (c) any incorrect use of the Nuance Products, or (d) any willful misconduct or negligent action or omission of Company.

**11.5.   Disclaimer.**   TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 11 ("LIMITED WARRANTIES") ARE EXCLUSIVE AND THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, AND NUANCE HEREBY EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE, AND/OR NON-INFRINGEMENT AND TITLE.  NUANCE DOES NOT GUARANTEE THAT THE SOFTWARE, EQUIPMENT OR SERVICES WILL YIELD ANY PARTICULAR BUSINESS OR FINANCIAL RESULT, OR THAT THE SERVICES WILL BE PERFORMED WITHOUT ERROR OR INTERRUPTION.

**11.6.**   Company acknowledges its responsibility to regularly back-up data and to adequately test, prior to deployment of each production version of the Software in a configuration that reasonably simulates Company's planned production environment.

**12.    LIMITATION OF LIABILITY.**

**12.1.**   The following provisions set out the exclusions and limitations of liability of Nuance and its Affiliates, and their respective officers, agents, contractors and employees, to Company and its Affiliates, and their respective officers, agents, customers, contractors and employees, under or in connection with this Agreement, and/or in connection with any tortuous act or omission including without limitation negligence and/or breach of duty including statutory duty arising under or in connection with this Agreement.

**12.2.**   Nothing in this Agreement shall be taken to exclude or limit Nuance's liability for fraud or fraudulent misrepresentation, for intentional or criminal misconduct; for death, personal injury or tangible property damage caused by its negligence in providing services at Company locations; or to the extent that such exclusion or limitation is not otherwise permitted by law.

**12.3.**   Subject to the foregoing provisions of this Section, Nuance shall not shall not be liable for loss of profits or revenues, loss of anticipated savings, loss of customers, or loss of use of any software or Data, nor for any special, consequential or indirect loss or damage, costs, expenses or other claims for consequential compensation, howsoever caused, which arise out of or in connection with this Agreement or the Services.

**12.4**   Save for Nuance's liability under the second subsection of this Section 12 ("Limitation of Liability"), which shall not be excluded or limited under this Agreement, the Parties, having assessed the risks, agree that Nuance's total liability shall not exceed for each consecutive 12 months period ("Annual Period") of this Agreement (the first period commencing on the Effective Date) an aggregate amount equal to 100% of the amount paid by the Company during the corresponding Annual Period.

**12.5.**   Under no circumstances shall Nuance's third party suppliers of any component of the Software, Hosted Services or Equipment be responsible or liable directly to Company or its affiliates for any damages, direct or otherwise, arising under this Agreement or otherwise arising from the transactions contemplated herein.  Such third party suppliers are third party beneficiaries of the foregoing sentence.

**13.    INDEMNIFICATION.**  Nuance shall, at its own expense, defend or, at its option, settle, any action brought against Company by a third party, during the Term, to the extent it is based on a claim that the Nuance Software and/or Hosted Services

infringes any United States or Canadian patent, copyright or trademark, or misappropriates a trade secret of such third party. Nuance will indemnify Company against any damages and losses that are attributable to such claim or action and are assessed against Company in a final judgment. Nuance shall have the foregoing obligations only if Company provides Nuance with (a) a prompt written request to undertake the defense in such claim or action, (b) sole control and authority over the defense and settlement thereof, and (c) all available information and assistance necessary to settle and/or defend any such claim or action. If the Nuance Software and/or Hosted Services becomes, or in the opinion of Nuance, is likely to become, the subject of an infringement claim or action, Nuance may, at its option, (a) procure, at no cost to Company, the right to continue using the Nuance Software and/or Hosted Services, (b) replace or modify the Nuance Software and/or Hosted Services to render it non-infringing, provided there is no material loss of functionality, or (c) if, in Nuance's reasonable opinion, neither (a) nor (b) above are commercially feasible, terminate Company's right to use such Nuance Software and/or Hosted Services and (i) with respect to perpetual Nuance Software licenses, refunding the license fees Company paid for such Nuance Software, depreciated on a straight-line sixty (60) month basis from the delivery date, and (ii) with respect to Hosted Services, or term licenses or maintenance and support fees for Nuance Software, refund any prepaid and unused fees paid by the Company for the infringing Nuance Software and/or Hosted Services. Nuance will have no obligation or liability under this Section for any claim or action resulting from any of the following: (a) any claim or action that would have arisen due to Company's business activities without use of the particular technology employed by the Nuance Software and/or Hosted Services, or (b) any claim or action resulting from any of the following: (i) modifications to the Nuance Software and/or Hosted Services by a party other than Nuance, (ii) the combination of the Nuance Software and/or Hosted Services with other products, processes, or materials not provided by Nuance if the Nuance Software and/or Hosted Services itself would not infringe, (iii) specifications or requirements supplied by Company that were used for the configuration of the Nuance Software and/or Hosted Services, or (iv) where Company continues allegedly infringing activities after being provided with modifications that would have avoided the alleged infringement. This Section states the sole obligation and exclusive liability of Nuance (express, implied, statutory or otherwise), and the sole remedy of Company, for any third-party claims or actions of infringement of any intellectual property or other proprietary right.

14. **MISCELLANEOUS.**

14.1. Assignment. Company shall not assign or otherwise transfer its rights and/or obligations under this Agreement, in whole or in part, to a third party unless such assignment is approved in writing by Nuance. Notwithstanding the foregoing, either Party may assign its rights and obligations hereunder to a third party in connection with (i) a merger with, (ii) the sale of substantially all of its assets to, (iii) a consolidation with, or (iv) the sale or intercompany assignment of a substantial part or all of its business utilizing this Agreement, provided (a) the assigning Party provides the other Party with prompt written notice of such sale, merger or consolidation, and (b) the assignee agrees to be bound by all terms and conditions set forth by this Agreement. Any such assignment by Company shall not increase the scope of any license or Service without the prior written consent of Nuance.

14.2. Force Majeure. Except for the obligation to make payments, nonperformance of either Party shall be excluded to the extent that performance is rendered impossible by strike, fire, flood, acts of God, governmental acts or orders or restrictions, acts of terrorism, war, failure of suppliers, or any other reason where failure to perform is beyond the reasonable control of the non-performing Party and not due to its fault or negligence.

14.3. Notices. All notices hereunder shall be sent by the notifying Party, in writing, to the other Party (Attention: General Counsel) at its address set forth above (or such other address as it may communicate to the notifying Party in writing). Notice shall be deemed delivered and effective (i) when delivered personally, (ii) five (5) days after posting when sent by certified United States mail (return receipt requested), or (iii) one (1) day after posting when sent by reputable private overnight courier (e.g., DHL, Federal Express, etc.).

14.4. Relationship between the Parties. In all matters relating to this Agreement, Company and Nuance shall not as independent contractors. Except as may be otherwise expressly permitted hereunder, neither Party will represent that it has any authority to assume or create any obligation, expressed or implied, on behalf of the other Party, or to represent the other Party as agent, employee, or in any other capacity. Nuance shall at all times have the sole right and obligation to supervise, manage, contract, direct, procure, perform, or cause to be performed all work to be performed by Nuance hereunder unless otherwise provided herein. Nuance shall, at all times, be responsible for the compliance of its third parties involved in the delivery of the Services in accordance with the terms and conditions of this Agreement. Nothing in this Agreement shall be construed to create any contractual relationship between Company and any such third parties, nor any obligation on the part of Company, to pay or to ensure the payment of any money due any such third party.

14.5. Governing Law. This Agreement shall be governed by the laws of the State of West Virginia, USA, without regard to choice of law rules, and Company hereby submits to the jurisdiction of the federal and state courts located in said State and the applicable service of process. The official text of the Agreement and any Addendum or any notices given on accounts or statements required hereby shall be in English. In Canada, Province of Quebec for all contracts drafted in English, both Parties agree to write this document in English. Les Parties ont convenu de rédiger le présent document en langue anglaise.

14.6. Injunctive Relief. Each Party acknowledges that any use or disclosure of Confidential Information by a Receiving Party in breach of this Agreement or any violation of Nuance's, its Affiliates' or their respective licensors' intellectual property rights may cause irreparable damage to the non-breaching Party, for which remedies other than injunctive relief may be inadequate, and the breaching Party agrees that it shall not object to the non-breaching Party seeking injunctive or other equitable relief to restrain

the alleged breach or violation. The Parties further agree that in the event such equitable relief is granted in the United States, they will not object to courts in other jurisdictions granting provisional remedies enforcing such United States judgments.

**14.7. Partial Invalidity; Waiver.** If any provision of this Agreement or the application thereof to any Party or circumstances shall be declared void, illegal or unenforceable, the remainder of this Agreement shall be valid and enforceable to the extent permitted by applicable law. In such event the Parties shall use reasonable efforts to replace the invalid or unenforceable provision by a provision that, to the extent permitted by applicable law, achieves the purposes intended under the invalid or unenforceable provision. Any deviation by a Party from the terms and conditions required under applicable laws, rules and regulations shall not be considered a breach of this Agreement. Neither a failure of a Party to exercise any power or right given to such Party hereunder or to insist upon strict compliance by the other Party with its obligations hereunder, nor any custom or practice of the other Party at variance with the terms hereof, shall constitute a waiver of a Party's right to demand exact compliance with the terms of this Agreement.

**14.8. Publicity.** Each Party is authorized to use the name and logo of the other Party on its website solely to identify such Party's relationship. In addition, either Party may refer to the existence of the Agreement or the relationship of the Parties in connection with a press release related to regulatory filings. Nuance may include Company's name in Nuance's customer list, and may identify Company as its customer in its sales presentations, marketing materials, advertising, promotion and similar public disclosures. Any additional statements regarding the relationship of the Parties hereunder shall require mutual written consent.

**14.9. Entire Agreement; Headings; Counterparts.** This Agreement, its Schedules, Exhibits, Amendments, and all Orders issued hereunder constitute the entire agreement and understanding between the Parties with respect to the subject matter hereof, and supersede all prior agreements, arrangements and undertakings between the Parties. No addition to or modification of any provision of this Agreement shall be binding upon the Parties unless made by a written instrument signed by a duly authorized representative of each of the Parties. The headings to the sections of this Agreement are for ease of reference only and shall not affect the interpretation or construction of this Agreement. This Agreement may be executed in counterparts and via electronic transmission, each of which shall be deemed to be an original and all of which shall be deemed to be an original instrument.

**14.10. Order of Precedence.** In the event of a conflict between or among the provisions in this Agreement, the order of precedence shall be as follows: (i) Schedules, (ii) General Terms and Conditions, (iii) Business Associate Terms and Conditions, (iv) Maintenance Services terms, and (v) each Order (except any invoicing or delivery terms explicitly stated on an applicable Order, or as explicitly otherwise provided in an applicable Order, or where the applicable Schedule states that Orders under such Schedule shall be superseding).

**14.11. No Third Party Beneficiaries.** Except as expressly stated otherwise in this Agreement, nothing in this Agreement is intended to create any rights in, or confer any benefits upon, any person or entity other than the Parties to this Agreement.

**14.12. Export Controls; Government Use.** Company shall comply with all applicable export and import laws and regulations and, unless authorized by applicable governmental license or regulation, shall not directly or indirectly export or re-export any technical information or software subject to this Agreement to any prohibited destination. If software or services are being acquired by or on behalf of the U.S. Government or by a U.S Government prime contractor or subcontractor (at any tier), the software, services and related documentation are "commercial items" as that term is defined at 48 C.F.R. 2.101. The software and documentation consists of "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212. Consistent with 48 C.F.R. 12.212 and 48 C.F.R. 227.7202-1 through 227.7202-4, all U.S. Government end-users acquire the software and documentation with only those rights set forth herein.

**14.13. Foreign Corrupt Practices Act.** Company shall comply with all applicable laws or regulations in all countries in which Company conducts business. The fact that in some countries certain laws prohibiting particular conduct are not enforced in practice or that violation is not subject to public criticism or censure, will not excuse noncompliance with those laws. Furthermore, Company confirms by way of signature of this Agreement that Company has knowledge and understanding of the Foreign Corrupt Practices Act of the United States of America ("FCPA") and shall comply with the FCPA at all times.

**14.14. HHS Audit Right.** Until the expiration of four (4) years after the furnishing of Services under this Agreement, Nuance shall make available, upon written request of the Secretary of the Department of Health and Human Services ("Secretary"), or upon request of the Comptroller General, or any of their duly authorized representatives, this Agreement and the books, documents and records of Nuance that are necessary to certify the nature and extent of the costs for which Company seeks reimbursement. Nuance further agrees that if Nuance carries out any of the duties of this Agreement through a subcontract with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period with a related organization, such subcontract shall contain a clause to the effect that until the expiration of four (4) years after furnishing services pursuant to such subcontract, the related organization shall make available to the Secretary or the Comptroller General, as the case may be, or any of their duly authorized representatives, the subcontract, and such books and documents and records of such organization that are necessary to verify the nature and extent of such costs.

**14.15. Discount Reporting Obligations.** Any discount or rebate, including a single discounted item or bundled discounts, received by Company hereunder is a "discount or other reduction in price," as such terms are defined under (i) the discount exception of the Medicare/Medicaid Anti Kickback Statute (42 U.S.C. § 1320a 7b(b)(3)(A)) ("Discount Exception") and (ii) the

"safe harbor" regulations regarding discounts or other reductions in price set forth in 42 C.F.R. § 1001.952(h) ("Discount Safe Harbor"), on the products or services purchased by Company under the terms of this Agreement. Under the Discount Exception or Discount Safe Harbor, Company may have an obligation to accurately report the net cost actually paid by Company, under any state or federal program which provides cost- or charge-based reimbursement for the products or services covered by this Agreement, or as otherwise requested or required by any governmental agency.

14.16   GPO.   Nuance and Company agree that this Agreement (inclusive of any Schedules and Orders) is not connected in any way to any General Purchasing Organization ("GPO"), and is not made part of or subject to the provisions of any GPO contract. No administrative fees (or similar fees) will be paid to any GPO as a result of the revenue hereunder.

IN WITNESS WHEREOF, the Parties have executed this Agreement under seal as of the date first set forth above.

| Princeton Community Hospital | Nuance Communications, Inc. |
|---|---|
| By: *Frank Sininger* | By: *Simon J Senior*  Simon J Senior (Dec 19, 2016) |
| Name: FRANK SININGER | Name: Simon J Senior |
| Title: Chief Financial Officer | Title: Senior Director, Global Sales Operations |
| Date: 15/13/2016 | Date: Dec 19, 2016 |

CONFIDENTIAL – PAGE 10

Exhibit A

HIPPA BUSINESS ASSOCIATE ADDENDUM

Business Associate Terms and Conditions

WHEREAS, Nuance (or "Business Associate") may, pursuant to the agreement to which this HIPAA Business Associate Addendum is attached (the "Agreement"), perform certain services on behalf of or for Company (or "Covered Entity") that require Nuance to access, create and use health information that is subject to the Health Insurance Portability and Accountability Act of 1996, Subtitle D of the Health Information Technology for Economic and Clinical Health Act, and their implementing regulations, as amended (collectively, "HIPAA"); and

WHEREAS, this Exhibit A, which is attached to and made part of the Agreement, serves to establish the responsibilities of both Parties regarding Protected Health Information ("PHI"), and to bring this Agreement into compliance with HIPAA.

NOW, THEREFORE, the Parties agree to the following additional terms and conditions to those otherwise in the Agreement:

AGREEMENT

1.  Definitions. Capitalized terms used in this Exhibit A, but not otherwise defined, shall have the same meanings ascribed to them in HIPAA.

2.  No Third Party Beneficiary. Nothing in this Exhibit A is intended, nor shall be deemed, to confer any benefits on any third party.

3.  Permitted Uses and Disclosures. Except as otherwise specified herein, Business Associate may use and/or disclose PHI to perform the functions, activities, or services for or on behalf of Covered Entity as specified in this Agreement, provided that such use and/or disclosure would not violate HIPAA if done by Covered Entity. Except as otherwise limited in this Agreement, Business Associate may:

    a.  use PHI for the proper management and administration of Business Associate and to carry out the legal responsibilities of Business Associate, and except as otherwise limited by this Exhibit A or the Agreement, as permitted by HIPAA.

    b.  disclose PHI for the proper management and administration of Business Associate and to carry out the legal responsibilities of Business Associate, provided that the disclosures are required by law, or Business Associate obtains reasonable assurances from the person to whom PHI is disclosed that the PHI will remain confidential and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies Business Associate of any instances of which it is aware in which the confidentiality of PHI has been breached.

    c.  use PHI to provide Data Aggregation services to Covered Entity as permitted by 45 C.F.R. §164.504(e)(2)(i)(B).

    d.  use PHI to create de-identified health information in accordance with 45 C.F.R. §164.514(b) and may disclose de-identified health information for any purpose permitted by law.

4.  Responsibilities of Business Associate. Business Associate agrees:

    a.  to use appropriate safeguards, and to comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement.

    b.  not to use or further disclose PHI other than as permitted or required by this Agreement or by law.

    c.  to report to Covered Entity any use or disclosure of PHI not provided for by this Agreement of which Business Associate becomes aware, including a Breach of Unsecured PHI as required by 45 C.F.R. § 164.410, and any successful Security Incident of which it becomes aware. The Parties acknowledge and agree that this section 4.c. constitutes notice by Business Associate to Covered Entity of the ongoing existence and occurrence or attempts of Unsuccessful Security Incidents for which no additional notice to Covered Entity shall be required. "Unsuccessful Security Incidents" means, without limitation, pings and other broadcast attacks on Business Associate's firewall, port scans, unsuccessful log-on attempts, denial of service attacks, and any combination of the above, so long as no such incident results in unauthorized access, use, or disclosure of PHI.

    d.  to make PHI about an Individual contained in any Designated Record Set of Covered Entity maintained by Business Associate available to Covered Entity for Covered Entity to comply with an Individual's right of access to their PHI in compliance with 45 C.F.R. §164.524.

e.  to make PHI about an Individual contained in any Designated Record Set of Covered Entity maintained by Business Associate available to Covered Entity for amendment and incorporate any amendment(s) to PHI that Covered Entity directs, in accordance with 45 C.F.R. §164.526.

f.  to make the information required to provide an accounting of disclosures of PHI with respect to the Individual available to Covered Entity in response to a request from an Individual in accordance with 45 C.F.R. §164.528.

g.  to the extent this Agreement requires Business Associate to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 C.F.R. Part 164, to comply with the requirements of Subpart E that apply to Covered entity in the performance of such obligation(s).

h.  to make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of, Covered Entity available to the Secretary of the Department of Health and Human Services or his/her designee (the "Secretary"), in a time and manner designated by the Secretary, for purposes of determining Covered Entity's compliance with the HIPAA.

i.  to ensure that any Subcontractors that create, receive, maintain, or transmit PHI on behalf of Business Associate agree to substantially the same restrictions and conditions that apply to Business Associate with respect to such information in accordance with 45 C.F.R. § 164.502(e)(1)(ii).

j.  if Business Associate knows of a pattern of activity or practice of a Subcontractor that constitutes a material breach or violation of HIPAA, to take reasonable steps to cure the breach or end the violation, as applicable, and if such steps are unsuccessful, terminate the contract or arrangement with such entity, if feasible.

k.  to the extent required by the "minimum necessary" requirements of HIPAA, Business Associate shall only request, use and disclose the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure.

l.  to refrain from receiving any remuneration in exchange for any Individual's PHI unless such exchange (i) is pursuant to a valid authorization that includes a specification of whether the PHI can be further exchanged for remuneration by the entity receiving PHI of that Individual, or (ii) satisfies one of the exceptions enumerated in the HIPAA regulations and specifically Section 13405(d)(2) of the HITECH Act.

m.  to refrain from marketing activities that would violate HIPAA and specifically Section 13406 of the HITECH Act.

5.  Responsibilities of Covered Entity.  Covered Entity shall:

a.  provide Business Associate with the notice of privacy practices that Covered Entity produces in accordance with 45 C.F.R. §164.520, as well as any changes to such notice.

b.  provide Business Associate, in writing, with any changes in, or revocation of, permission by Individual to the use or disclosure of PHI, if such changes affect Business Associate's permitted or required uses or disclosures. Upon receipt by Business Associate of such notice of changes, Business Associate shall cease the use and disclosure of any such Individual's PHI except to the extent it has relied on such use or disclosure, or where an exception under HIPAA expressly applies.

c.  notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 C.F.R. §164.522.

6.  Termination.

a.  Termination for Cause.  Either Party may immediately terminate this Agreement if such Party (the "Non-Breaching Party") determines that the other Party (the "Breaching Party") has breached a material term of this Exhibit A. Alternatively, the Non-Breaching Party may choose to provide the Breaching Party with written notice of the existence of an alleged material breach and afford the Breaching Party an opportunity to cure the alleged breach. Failure to cure the material breach within thirty (30) days of the written notice constitutes grounds for immediate termination of this Agreement.

b.  Effect of Termination.

(1)  Except as provided in paragraph (2) of this Section 5(b), upon termination of this Agreement for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This Section 5(b)(1) shall apply to PHI that is in the possession of Business Associate and its subcontractors or agents. Business Associate shall retain no copies of the PHI.

(2)  In the event that Business Associate reasonably determines that returning or destroying the PHI is infeasible, Business Associate shall provide to Covered Entity, in writing, notification of the conditions that make return or destruction infeasible, and Business Associate shall extend the protections of this Exhibit A to such PHI and limit

further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

7.   Indemnification.

Business Associate shall reimburse, indemnify and hold harmless Covered Entity for all costs, expenses (including reasonable attorneys' fees), damages and other losses resulting directly from any negligent breach of this Business Associate Addendum, Security Incident or Breach of PHI maintained by Business Associate or Business Associate's agent or subcontractor, subject to the provisions of the Agreement. The foregoing includes, without limitation: fines or settlement amounts owed to a state or federal government agency; the cost of any notifications to individuals or government agencies; credit monitoring for affected individuals; or other mitigation steps taken by Covered Entity to comply with HIPAA or state law.

Exhibit B

Schedules

### SCHEDULE for DRAGON MEDICAL ONE (FORMERLY KNOWN AS DRAGON MEDICAL 360 | DIRECT), POWERMIC MOBILE, AND DRAGON MEDICAL ADVISOR

The terms of this Schedule for Dragon Medical One (formerly known as Dragon Medical 360 | Direct), PowerMic Mobile, and Dragon Medical Advisor ("Schedule") apply to the Hosted Services and Client Software (as defined below) specified in an Order. In the event of a conflict between the General Terms and Conditions and the terms of this Schedule, the terms of this Schedule will prevail.

1. **DEFINITIONS.** For purposes of this Schedule, the following terms shall have the following meanings:

   1.1  "**Authorized User**" means a single employee, agent or contractor at a Healthcare Facility

   1.2  "**Client Software**" means the Nuance Software, if any, provided to Company by Nuance, as part of the Hosted Services.

   1.3  "**Device**" means a personal computing device as specified in the accompanying Documentation.

   1.4  "**Fees**" means the fees for the Hosted Services and Client Software, as set forth on the applicable Order.

   1.5  "**First Productive Use**" means the date upon which Nuance has electronically delivered a URL that provides access to Hosted Solution functionality to Company, thereby enabling Company to install and access the Hosted Solution.

   1.6  "**Hosted Services**" means any of the following Software as a Service (SaaS) offerings owned and operated by Nuance, and specified in an Order; which SaaS offerings are made available to Company as a service via the Internet: (i) Dragon Medical One; (ii) PowerMic Mobile; and/or (iii) Dragon Medical Advisor.

   1.7  "**Hosted Solution**" means the collective offering of the Hosted Services and the associated Client Software.

   1.8  "**Healthcare Facility**" means a hospital, physician office, outpatient center, surgical facility, or other facility delivering healthcare services, that is wholly owned or controlled by Company. For purposes of this definition, "control" means (i) the power to elect a majority of the directors of a corporation or similar officers of an entity, or (ii) the power by contract to operate or manage the day-to-day operations of a health care facility.

   1.9  "**Payment Schedule**" means the payment schedule set forth on the applicable Order.

   1.10  "**Pilot Order**" means the Order dated _____, which is a supplement to this Agreement and identifies the Hosted Services, Equipment, and other Services purchased by Company, and the price associated with each.

   1.11  "**Pilot Period**" means the period for which Company is granted the rights to the Hosted Services and Client Software pursuant to the Pilot Order. The Pilot Period begins on project kickoff ("project kickoff" being the date on which the first meeting occurs between the Nuance project manager and Company) and continues for the period of time set forth on the Pilot Order.

   1.12  "**Service Term**" means the term for which Company is granted the rights to the Hosted Services and Client Software, which term is as specified in Section 6.1 of this Schedule.

   1.13  "**Term License**" means a license grant that is limited in duration, which duration is as indicated in the applicable Order, subject to early termination pursuant to the Agreement.

2. **GRANT OF RIGHTS.**

   2.1  **Hosted Services.** Subject to the terms and conditions of the Agreement (including this Schedule), for each subscription to the Hosted Solution purchased (as indicated in the applicable Order) Nuance hereby grants Company, and Company accepts, a revocable, non-exclusive, non-transferable, limited right to allow a single Authorized User to remotely, via the Internet, access and use the Hosted Services during the Service Term or Pilot Period, as the case may be; provided such access and use is: (i) in a manner commensurate with the intended use of the Hosted Services (as prescribed by the Agreement and the Documentation), (ii) solely for Company's internal business purposes performed at a Healthcare Facility, and (iii) if the Hosted Service is PowerMic Mobile or Dragon Medical Advisor, then PowerMic Mobile or Dragon Medical Advisor may only be used in conjunction with a valid subscription of the Dragon Medical One Hosted Service (licensed separately) or a valid license of the Dragon Medical Network Edition Software (licensed separately).

   2.2  **Client Software.** Subject to the terms and conditions of the Agreement (including this Schedule), Nuance hereby grants Company, and Company hereby accepts, a revocable, non-exclusive, non-transferable, non-sublicensable, limited license to allow Authorized Users to use the Client Software, during the Service Term or Pilot Period, as the case may be, for the sole and limited purpose of accessing and using the Hosted Services as per the rights granted in Section 2.1 of this Schedule; provided that such use is in a manner commensurate with the intended use of the Client Software (as prescribed by the applicable Documentation).

3. **NUANCE RESPONSIBILITIES.**

   3.1  **Hosted Services.** Nuance agrees to host, operate and maintain the equipment and software comprising its Hosted Services, and to allow Company to access and use the Hosted Services, during the Service Term or Pilot Period, as the case may be, in accordance with the terms and conditions of the Agreement.

3.2   Support. During the Service Term or Pilot Period, as the case may be, Nuance will provide maintenance and support services for the Hosted Solution as outlined in this Section 3.2.

    3.2.1   Error Correction. Nuance shall promptly repair any errors which are reported either in writing or verbally. An error is defined as any operation of the Hosted Solution that is different than described in the Documentation. An error also includes a "bug" or "crash" in which the Hosted Solution or portions of the Hosted Solution cease to function.

    3.2.2   Company Contact; Question and Answer Support. Company must identify an Administrative Contact, a Technical Contact and an Executive Contact. These individuals must communicate to Nuance about the services rendered hereunder and then will be responsible for communicating, as needed, with Company staff. Nuance will provide question and answer support only to the Administrative Contact, the Technical Contact, and the Executive Contact or their designee. Nuance is not responsible for providing support services directly to transcriptionists or to clinicians. Nuance does not designate a specific limit on the Question/Answer support that it provides, but rather assumes that the existing staff will be adequately trained. However, if over a period of two consecutive weeks, a Company contact persistently calls Nuance for question/answer support, and such Company contact has not attended the appropriate Nuance training classes, then Company agrees to either send the contact(s) to Nuance University classes at Nuance's then-standard rates, or, alternatively, meet with Nuance to review the situation. For the purposes of this Section, the term "persistently" shall mean multiple telephone calls with questions every day.

    3.2.3   Service Hours. Nuance shall provide service/support from 8:30 am to 5:00 pm, Monday through Friday in Company time zones, excluding the following holidays: New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas Day. Nuance shall provide seven days a week, 24-hour per day support for Emergency Events. An Emergency Event is defined as a problem that (a) prevents clinicians from dictating reports; (b) prevents users from accessing the Hosted Solution; (c) prevents multiple transcriptionists from transcribing or editing documents; (d) prevents the printing of documents or (e) prevents interface transactions (i.e., the transmission from or receipt of data by Company's computer systems).

    3.2.4   Third Party Supplied Software Interoperability. Software residing on Company's work stations is not covered by this Schedule. Upgrades and new releases of all such third-party software are not provided or maintained by Nuance and must be obtained separately by Company. In a Microsoft environment, it is possible that programs provided by other vendors (e.g. an email program) may conflict with the Hosted Services. Nuance disclaims responsibility for any such conflicts.

4.   COMPANY RESPONSIBILITIES.

4.1   Project Manager. During installation and operation of the Hosted Solution, Company shall provide a qualified individual who will manage and monitor the installation and assist with any issues that may arise during routine operation of the Hosted Solution.

4.2   Equipment and Internet Connectivity. Company shall provide, at its own expense, telecommunications (including Internet connectivity), firewall, and all equipment and operating system software necessary for Authorized Users to access and use the Hosted Solution, as recommended in the Documentation. Nuance shall have no responsibility for any costs incurred in connection with modifications or enhancements to Company's system necessary for implementing Company's interface with the Hosted Services or in connection with Company's use of the Hosted Services. Nuance will not be responsible for any fees billed by Company's or an Authorized User's mobile operator for use of the wireless or cellular networks necessary to send and receive data from the Hosted Service. The communications and network interoperability requirements for Internet access to the Hosted Services are as described in the Documentation.

5.   PAYMENT. Upon commencement of the Service Term or Pilot Period, as the case may be, Nuance shall invoice Company for the Fees in accordance with the Payment Schedule, and Company shall pay to Nuance each invoice within thirty (30) days of the date of such invoice.

6.   TERM AND TERMINATION.

6.1   Service Term. Subject to the right to terminate as set forth in the Agreement, the Initial Service Term shall be as set forth in the applicable Order. Thereafter, subject to the right to terminate as set forth in the Agreement, the Service Term will automatically renew at Nuance's then-current pricing for the Hosted Service(s), unless otherwise agreed to by the Parties in an Order, for successive one (1) year periods unless either party notifies the other party, in writing and at least ninety (90) days prior to the expiration of the then-current Service Term, of its decision not to renew the Service Term. The Initial Service Term will commence upon First Productive Use or one hundred eighty (180) days following the date of the applicable Order, whichever occurs first. Notwithstanding the preceding sentence, if Company has entered into a Pilot Order with Nuance, and then purchases a paid subscription for the Hosted Services, the Initial Service Term will begin immediately after the Pilot Period ends. Each renewal Service Term, if applicable, will commence immediately following expiration of the prior Service Term. Upon expiration or termination of the applicable Order or the Agreement, by either party, the Service Term shall terminate.

6.2 **Effect of Termination.** Upon the expiration or termination of the Service Term or Pilot Period, as the case may be, Company's rights to access and use the Hosted Services, as well as Company's rights to use the associated Client Software, will terminate. Neither the expiration nor termination of the Service Term or Pilot Period, as the case may be, shall affect Company's payment obligations. If the Service Term is terminated prior to the completion of the then-current Service Term, other than by Company in accordance with the Agreement for Nuance's uncured material breach, Company shall pay Nuance a fee equal to the total amount of Fees that would have come due over the remainder of the then-current Service Term but for the early termination ("Early Termination Fee"). Nuance shall invoice Company, in full, for the Early Termination Fee following the date of termination of the Service Term.

7. **ADD-ON SOFTWARE: POWERPACK (FOR DRAGON MEDICAL ONE) AND SMARTLIBRARY SOFTWARE.**

7.1 **Applicability.** If the Order includes any of the following Software: Powerpack (for Dragon Medical One) or SmartLibrary Software (all such Software, the "Add-on Software"), then the terms in this Section 7 apply.

7.2 **Grant of Rights.** Subject to the terms and conditions of the Agreement (including this Schedule), for each license to the Add-on Software purchased (as indicated in the applicable Order), Nuance hereby grants Company, and Company accepts, a limited, revocable, non-exclusive, non-transferable, non-sublicensable license to allow a single Authorized User to use the Add-on Software for the duration of the Term License, provided such use is: (i) in a manner commensurate with the intended use of the Add-on Software (as prescribed by the Agreement and the Documentation), (ii) solely for Company's internal business purposes, and (iii) solely in conjunction with a valid subscription of the Dragon Medical One Hosted Service (licensed separately).

7.3 **PowerPack (for Dragon Medical One) Administrator Licenses.** If the Add-on Software is Powerpack (for Dragon Medical One), then Company's rights under this Section 7 shall include allowing up to two (2) Company employees and contractors to use the Powerpack Administrator licenses to manage the user options and perform maintenance tasks on the Powerpack (for Dragon Medical One) Software. For the avoidance of doubt, the Powerpack Administrator portion of the Software cannot be used for clinical documentation.

8. **RIGHT TO COPY.** Pursuant to the rights granted under Sections 2.2 and 7.2 of this Schedule, Company may reproduce and install copies of the Client Software and Add-on Software, as the case may be, on as many Devices as is reasonably necessary to exercise its license rights under Sections 2.2 and 7.2. All such copies must be true and complete copies (including intellectual property notices) and be made from media or files supplied by Nuance to Company under the Agreement or from a network source if true and complete copies of such media or files supplied by Nuance are copied to the network source.

9. **RESTRICTIONS.** Company shall not allow any Authorized User to access and use the Hosted Services, Client Software, or Add-on Software for: (a) the Authorized User's personal use, or (b) the benefit of any third party. Company shall not: (i) allow anyone other than the Authorized Users to access or use the Hosted Services, Client Software, or Add-on Software, or any components thereof, or (ii) interfere with or disrupt the integrity or performance of the Hosted Services.

10. **"CUSTOMER LOYALTY DISCOUNTS" FOR PREVIOUSLY PURCHASED PERPETUAL LICENSES OF DRAGON MEDICAL SOFTWARE.**

10.1 **Eligibility.** From time to time Nuance may at its sole discretion offer a promotion wherein Company may receive a discount ("Customer Loyalty Discount") when purchasing new subscriptions of the Dragon Medical One Hosted Service in exchange for surrendering or terminating previously purchased perpetual licenses of certain Dragon Medical Software from Nuance or a Nuance-authorized reseller (the "Legacy Licenses"). If an Order identifies a Customer Loyalty Discount, then upon Company's acceptance of the Order, Company's rights to the Legacy Licenses shall terminate automatically, Company shall immediately cease using, un-install, and return to Nuance or destroy, the Legacy Licenses, and any copies thereof as well as license keys (if any). Upon written request from Nuance, Company shall certify to Nuance in writing and within ten days of the request that Company has taken such action as described in the previous sentence. Any Maintenance Services for the Legacy Licenses shall also be automatically deemed terminated upon Company's acceptance of the Order.

10.2 **Application of the Discount.** The details and underlying mechanism regarding the calculation of the Customer Loyalty Discount will be applied by Nuance on a case by case basis and outlined in an Order to the Company. For the avoidance of doubt, Company will not receive a refund for any pre-paid Maintenance Services associated with the Legacy Licenses, as any pre-paid amounts are calculated into the Customer Loyalty Discount. Unless otherwise indicated on the Order, any Customer Loyalty Discount which may be offered by Nuance to Company will be amortized over the first three years of the Service Term (if the initial Service Term is five years), or over the first two years of the Service Term (if the initial Service Term is three years).

11. **PILOT.** ANY PROFILE OR PERSONALIZATION DATA THAT COMPANY ENTERS INTO THE HOSTED SOLUTION(S), AND ANY CUSTOMIZATIONS MADE TO THE HOSTED SOLUTION(S) BY OR FOR COMPANY DURING THE PILOT PERIOD WILL BE PERMANENTLY LOST UNLESS COMPANY PURCHASES A SUBSCRIPTION TO THE SAME HOSTED SOLUTION(S) AS THOSE INDICATED IN THE PILOT ORDER, OR EXPORTS SUCH PROFILE OR PERSONALIZATION DATA, WITHIN SIXTY (60) DAYS OF THE PILOT PERIOD ENDING, UNLESS OTHERWISE AGREED TO BY THE PARTIES.

### Amendment to the Healthcare Master Agreement

This Amendment ("this Amendment") modifies and supplements the Healthcare Master Agreement with an Effective Date of December 19, 2016 (the "Agreement") by and between Nuance Communications, Inc. ("Nuance") and Princeton Community Hospital , having a place of business 122 12th St, Princeton, WV 24740 ("Customer" or "Company"). Customer and Nuance are hereinafter referred to individually as a "Party" and collectively as the "Parties." This Amendment shall take effect as of the first day of the calendar month after the last party signs this Amendment (the "Amendment Effective Date"). Except as modified by this Amendment, the Agreement shall remain in full force and effect and shall be enforceable in accordance with its terms. In the event that the terms of this Amendment conflict with the terms of the Agreement, the terms of this Amendment shall govern. All capitalized terms not otherwise defined in this Amendment shall have the meanings ascribed to them by the Agreement.

WHEREAS, Nuance and Customer entered into the Agreement as specified above; and

WHEREAS, Nuance and Customer wish to supplement the Agreement by adding a new Schedule.

    A.  As of the Amendment Effective Date, the Parties hereby modify the Agreement as follows:

        Attachment 1, containing the Schedule terms of use for (i) Compliant Documentation Management Program ("CDMP Schedule"), and for (ii) Clintegrity Software Products and Services ("Clintegrity Schedule"), which are each hereby incorporated as Schedules as part of the Agreement as of the Amendment Effective Date.

*EACH OF THE INDIVIDUALS SIGNING THIS AMENDMENT REPRESENTS AND WARRANTS THAT THE PARTY FOR WHOM HE OR SHE IS ACTING HAS DULY AUTHORIZED THE EXECUTION AND PERFORMANCE OF THIS AMENDMENT.*

**Nuance Communications Inc.**

Signature: _____

Name: _____

Title: _____

Date: _____

**Princeton Community Hospital**

Signature: _____

Name: Jeffrey Lilley

Title: CEO

Date: 6/22/17

Attachment 1
## SCHEDULE FOR COMPLIANT DOCUMENTATION MANAGEMENT PROGRAM
## ("CDMP SCHEDULE")

This Schedule is entered into in connection with one or more Statements of Work or Orders ("Orders") which are separately signed, and which are hereby incorporated into and made part of this Schedule by reference. In the event of a conflict between this Schedule and the terms of an Order, the terms of the Order will prevail. Company may also be referred to as "Customer" in applicable Orders.

1. **Definitions.** For purposes of this Schedule, the following capitalized terms shall have the following meanings:

a. "CDMP" means the Clinical Documentation Management Program ("CDMP") including the Software, Services and Materials.

b. "Clintegrity Schedule" shall mean the separate Schedule entitled Schedule for Clintegrity Software Products and Services, which is attached to the Agreement as a Schedule.

c. "Continuing Education Services" is defined in Section 2(e) below.

d. "Conversion" or "Conversion Services" means the conversion of Customer from using the pre-existing software provided under a prior agreement between Nuance and Customer (JATA CDMPGuide Software or Clintegrity CDI Software) to the Software being implemented under the a Statement of Work for Implementation of Clintegrity CDI or Clintegrity CACDI Software, as applicable. Conversion is a type of Implementation, see the applicable Statement of Work for the scope of services.

e. "Documentation" means an on line Help file in the Software.

f. "Fees" means the fees for the Services and Software as set forth on the applicable Order or SOW.

g. "Hosted Service" is defined in the Clintegrity Schedule.

h. "Implementation" or "Implementation Services" means a project to license Customer and train its hospital personnel in the proper use of the Software and in CDMP as described in a Statement of Work and in the Clintegrity Schedule.

i. "Implementation Closeout" is defined in the SOW, section entitled "CDMP Cost Proposal." Statements of Work for Conversion Services may also refer to Implementation Closeout which is defined in the applicable SOW, section entitled "CDMP Cost Proposal."

j. "Initial Term" is defined in the SOW, section entitled "CDMP Cost Proposal."

k. "JATA" means Nuance's JA Thomas and Associates (JATA) consulting and education brand. References to JATA in a Statement of Work shall be understood to refer to Nuance.

l. "Materials" means manuals and web-based services provided as part of Implementation and Continuing Education including MS-DRG Strategy Academy, CDMP® Education®, HealthcareProfiles.com, and DRG Guidebooks.

m. "Plan" means the Technical Support Services and Software Updates Plan which is described in Section 7 ("Support and Maintenance Services") of the Clintegrity Schedule.

n. "Software" means the object code version of the Clintegrity CDI Software, or the Clintegrity CACDI Software, as and to the extent provided under the applicable Statement of Work, including Updates, Upgrades and Documentation.

o. "Statement of Work" or "SOW" means a detailed description of the Implementation Services (or Conversion Services), or other Services, and fees signed by the Parties. Additional Services may also be purchased under subsequent SOWs pursuant to this Schedule. An SOW is considered an Order under the Agreement.

p. "Subscription" means and includes the license grant to use the Software (and Hosted Services if applicable), and the Technical Support Services and Software Updates Plan for the Software, as further set forth in the Clintegrity Schedule.

q. "Technical Support Services and Software Updates Plan" means the technical support and Software updates and Services as described in Section 7 of the Clintegrity Schedule.

2. **Services.**

a. *Assessment.* Subject to the terms and conditions of the Agreement and this Schedule, and the applicable SOW, Nuance agrees to perform a preliminary analysis of Customer's clinical documentation in accordance with the applicable Statement of Work.